IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STEEL WORKERS, LOCAL 10-00086, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | No. 15-5374 |
| v. | : | |
| | : | |
| MERCK & CO., INC., | : | |
| Defendant. | : | |

## MEMORANDUM

This case involves the appeal of an arbitrator's award entered pursuant to a collective bargaining agreement.  The Union, represented by able and experienced counsel, contends that this is one of the rare instances where such an award is subject to reversal, because the effect of the arbitrator's ruling is to amend the terms of the agreement, clearly exceeding the scope of his authority.  I recognize the Union's concern over the potential implications of the arbitrator's conclusions, and if the record established that the arbitrator had in fact re-written the contract in making his award, this case might fall within the scope of a judge's limited authority to set it aside.  But based on the specific facts of this case, I am persuaded that the arbitrator's ruling is within the range of reasonable interpretations of the agreement.  Summary judgment must therefore be granted in favor of Defendant.

## I.   Standard of Review

Because this case has been adjudicated by an arbitrator under a collective bargaining agreement (CBA), the scope of review is extraordinarily limited.  Unless the arbitrator's award fails to "draw its essence" from the parties' CBA – such that there is "absolutely no support at all in the record justifying the arbitrator's determinations" – I must enforce the award reached

1

through arbitration.  *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995); *see also Akers Nat'l Roll Co. v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 712 F.3d 155, 165 (3d Cir. 2013) ("The *sine qua non* of judicial review of an arbitration award is a heavy degree of deference to the arbitrator.")

"'[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision.'"  *Akers Nat'l Roll Co.*, 712 F.3d at 160 (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)). To vacate, a court must find that the arbitrator's award "ignore[s] the plain language of the contract."  *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

## II.    <u>Background of the Dispute</u>

The Union filed for arbitration in this case after a cadre of Union workers in West Point, PA, lost their jobs.  These workers had produced a blood-sugar regulation pill named Janumet for Defendant Merck at its West Point facility, and they were fired after Merck decided to cease Janumet production at the plant.  The Union filed for arbitration alleging that the layoffs violated Article 15 of the parties' CBA – an anti-subcontracting clause that has been in place since 1984.

Article 15 of the CBA prohibits Merck from "contract[ing] out work to individuals or to other companies which is normally performed by bargaining unit(s) employees where the necessary equipment is at hand, qualified employees are available, project completion dates can be met and results would otherwise be consistent with efficient and economic operations."  CBA, Art. 15, Plf.'s Exh. A at 56.  The Union alleges that Merck subcontracted – i.e., outsourced – its members' jobs by contracting with foreign manufacturers to produce Janumet and then

2

discontinuing Janumet production at West Point.  Merck counters that it did not outsource the Union's jobs because it did not move jobs at all; it just hired workers (at West Point and elsewhere) when Janumet demand rose, and fired workers when demand fell.

### A.  The  Grievance

The Union's argument at arbitration was straightforward:  Merck promised that it would not outsource Janumet production jobs.  Then, Merck contracted with other corporations to manufacture Janumet in other factories.  After those contracts became active, Merck downsized – and then closed – its Janumet production wing at West Point, while other manufacturers continue to produce Janumet.

Merck's response was twofold.  First, it made clear that West Point workers only ever produced Janumet in a "backup" capacity.  From the time West Point workers first contracted with Merck to make Janumet, their production was secondary in nature; indeed, by contract they could produce at most 20% of Merck's Janumet needs.  Thus, Merck argued, Janumet production at West Point could not be considered "work normally performed by bargaining unit employees." CBA; Award at 15.  Second, Merck maintained that the West Point jobs were not moved, or – in the language of the CBA – "contracted out," because it ceased production at West Point without hiring elsewhere.  According to Merck, it was simply reacting to the global rise and fall of Janumet both when it hired workers (at West Point and elsewhere) in 2012-2013 and when it fired workers in 2014.

### B.  The Arbitrator's Decision

On October 7, 2014, December 9, 2014, and March 23, 2015, Arbitrator Shyam Das held a full arbitration hearing at which the parties argued and submitted evidence about the alleged CBA violation.  At this hearing, the parties presented evidence about Merck's history of Janumet

production, both at West Point and at other facilities.  In finding for Merck, the arbitrator concentrated on two main points.

### 1. *Merck's Other Janumet Production*

Merck has always produced Janumet in places other than its West Point plant.  Its first and largest producer of Janumet was a U.S. company with production facilities in Puerto Rico named Patheon, which Merck contracted with in early 2006 to produce at least 80% – and up to 100% – of Merck's demand for the drug.  Merck first contracted with West Point in 2007, when it became clear that Patheon would need help meeting Merck's Janumet demand.  Award at 21.

Patheon was ultimately authorized to manufacture for distribution in 70 markets worldwide.  Award at 2.  In contrast, initially West Point was approved to manufacture for distribution only within the United States, and when it later received authorization for the European Union, such authority was limited to the lower dose of the drug. Award at 3.

Between 2007 and 2013, demand for Janumet rose and Merck responded.  Production facilities at West Point and at Patheon were upgraded, and two new production sites were added – a Merck plant in Singapore and an external British supplier called Aesica.  Award at 4-5.  The Union did not file a grievance when Aesica (or the Singapore plant) began producing Janumet in 2012-2013.  Award at 17.  Though Patheon still produced at least 80% of Merck's Janumet, demand was so high that Merck hired numerous workers at West Point, in Singapore, and in the U.K., whose primary task was Janumet production.  *Id* at 5.  In 2013, however, Janumet demand peaked and then fell.  Merck therefore downsized, and ultimately discontinued, production at West Point – its most limited and outdated Janumet production site.[1]

---

[1] From the record before me, there is no evidence that Merck's layoffs at West Point were matched with layoffs at Patheon or Aesica.  *Award at 13*.

In order to fairly determine whether Janumet production was "contracted out," the arbitrator found that considering Merck's other Janumet production contracts, both those that predated and post-dated its contracts at West Point, would be necessary. Award at 21. The pre-existing primacy of Merck's contract with Patheon – guaranteeing it a minimum 80% of all Janumet production – and the fact that Merck discontinued, rather than moved, the West Point jobs, substantially influenced the arbitrator's award. *Id at 23.*

2. *The Context and Circumstances of West Point Janumet Production*

The arbitrator also placed substantial weight on the "context and circumstances under which" workers produced Janumet at West Point. Because a central question in the arbitration was whether Janumet production was "work normally performed by bargaining unit employees," the arbitrator found it necessary to consider Janumet production's place within the larger West Point facility and the global marketplace. Award at 21.

Janumet production was a small fraction of the work done at West Point. Ninety-five percent of bargaining unit workers at the plant manufactured large-molecule injectable biologics, such as vaccines, rather than small-molecule products in pill form like Janumet. Over the last fifteen years, Merck had invested extensive resources in supporting and expanding West Point's large-molecule capacity, award at 8, and had "moved" the production of "numerous other small-molecule products . . . without any challenge from the Union." Def. MSJ at 25.

The arbitrator also found it significant that Merck communicated clearly to the Union that its Janumet production would be in excess capacity only. He concluded that West Point was an "alternative" or "backup" to Patheon's primary production, *see* Award at 16, 23, based on the fact that the West Point factory was formally designated as an "additional" or "alternative"

manufacturer in regulatory licensing documents, and limited to two jurisdictions worldwide. Award at 4.

   *3.   The Union's Challenge*

   The Union now challenges the arbitrator's award, arguing that the arbitrator made his decision based on principles that were not bargained for and are not encompassed within the CBA.  Specifically, the Union argues the arbitrator impermissibly "used third-party contracts and un-bargained for concepts about exclusivity and primacy to interpret the already plain and unambiguous language of Article 15."  Plf's MSJ at 3.   This would exceed the arbitrator's power and further violate the CBA, because Article 12  provides that "the arbitrator shall have no power to add to, subtract from, or modify any of the terms of the Agreement or any agreements made supplementary thereto."  Plf's. Exh. A at 50.  Accordingly, I review the arbitrator's award to determine whether it "arguably construes or applies" the CBA, or impermissibly rewrites it. *Akers Nat'l Roll Co*., 712 F.3d at 160.

## III.  <u>Discussion</u>

   The parties dispute whether the arbitrator provided one justification for his decision under Article 15, or two.  I am persuaded that Merck is correct, and that the arbitrator found both that the work in question was "normally performed," and, as a separate rationale, that the work was not "contracted out."  Proceeding from that baseline, I cannot conclude that the arbitrator exceeded his authority in declining to find a contractual violation, as this is not a case where it can be said there is "absolutely no support at all in the record justifying the arbitrator's determinations."  *United Transp. Union*, 51 F.3d at 379.

**A. It was reasonable for the arbitrator to conclude that Article 15 was sufficiently ambiguous to require extrinsic evidence.**

Article 15 prohibits "contract[ing] out work . . . which is normally performed by bargaining unit employees." CBA, Art. 15, Plf's. Exh. A at 56. Use of the modifier "normally" is significant for two reasons. First, if *all* work performed at the plant were automatically included within the scope of Article 15, no modifier would be necessary. Second, "normal" refers to that which is usual or customary. I am hard-pressed to see how an arbitrator could apply Article 15 without some inquiry into the role West Point played in the overall production of Janumet. The Union characterizes the arbitrator's approach as the introduction of concepts that were not the subject of bargaining (thereby violating Article 12), but this is not persuasive in view of the specific language the arbitrator was required to construe.

An arbitrator may properly consider the facts surrounding the contract at issue. "[I]nterpretation of a collective bargaining agreement is more than just an analysis of its language; it requires the Court to look beyond the face of the collective bargaining agreement, and consider the practice, usage and custom pertaining to the terms of the CBA." *Int'l Union, United Mine Workers v. Racho Trucking Co.*, 897 F.2d 1248, 1254 (3d Cir. 1990). In *Akers Nat'l Roll Co.*, 712 F.3d at 160, the Court of Appeals quoted at length from a Supreme Court discussion of collective bargaining agreements, as follows:

> A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts. It is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The collective agreement covers the whole employment relationship. It calls into being a new common law-the common law of a particular industry or of a particular plant. In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.

7

*Transportation-Communication Employees Union v. Union Pac. R.R.,* 385 U.S. 157, 160-61

(1966) (citations and internal quotations omitted).

     The arbitrator here was faced with a situation where Merck ceased production at West

Point in the face of plummeting demand, without evidence that it replaced the jobs elsewhere.

This strikes as an example of what the Supreme Court termed "cases which the draftsman cannot

wholly anticipate." The Union argues that the arbitrator imported concepts of "primacy" and

"exclusivity," but it can just as well be said that these terms were employed as the arbitrator

grappled with what is meant by "normally." The question before me is not whether the arbitrator

was correct. "[A] labor arbitrator's award does draw its essence from the collective bargaining

agreement if the interpretation can in any rational way be derived from the agreement, viewed in

the light of its language, its context, and any other indicia of the parties' intention." *Akers,* 712

F.3d at 160. Given the particular language of Article 15 and the circumstances of this case, I am

persuaded that the arbitrator acted within his authority in considering the course of dealings

surrounding Janumet.

   **B.  The arbitrator "arguably construed" the CBA.**

     In deciding whether the work was "normally performed" as West Point, the arbitrator

placed substantial weight on its role as a "backup facility," as set forth above. The validity of

this as a basis for decision is dependent upon whether consideration of such extrinsic evidence

was proper, and I have concluded it was. The Union has advanced sound arguments against the

arbitrator's conclusion, but the merits of those arguments are not before me.

     As to whether the work was "contracted out," the arbitrator concluded that no violation

occurred because the jobs were eliminated and not replaced by jobs in other factories. Award at

23. The Union contends that this ignores the plain language of the contract, *Pa. Power Co. v.*

*Local Union No. 272 of the IBEW*, 276 F.3d 174, 178 (3d Cir. 2001), and advances valid arguments as to why Article 15 prohibits drawing such a distinction. But the Union ignores the fact that the arbitrator was tasked with determining what it means to "contract out" in the face of plummeting demand for a product manufactured by several suppliers, on a record where there is no evidence that a single job from West Point moved elsewhere.

As to Patheon, the arbitrator's award is well with the range of reasonable interpretation, because the contract with Patheon predated the contract at West Point, and the Union was explicitly advised that West Point was to play a supplemental role. Award at 23 n.7. It would be patently unreasonably to construe Article 15 as requiring continued production of a medication for which there is no market demand. As to Aesica, the Union's argument is much stronger, because Aesica is an outside supplier with whom Merck contracted *after* West Point came on line. There is force to the argument that given the chronology here, West Point was entitled to priority, and that stopping production at West Point while leaving Aesica online is in practical terms no different than subcontracting the work. But the CBA does not clearly address this set of circumstances, an ambiguity underscored by the fact that the Union did not pursue a grievance when Merck first contracted with Aesica or even when the first layoffs at West Point occurred.[2]

The Union's concern is understandable – it seeks to prevent a situation where the company subverts the anti-subcontracting by strategic expansion and contraction. But the record here does not suggest that Merck expected demand to rise and then fall, and undertook its expansion of operations for the purpose of replacing Janumet production at West Point with

---

[2] In a revealing footnote, the arbitrator observed that even the Union acknowledged this reality: "Plant Chairman Bangert testified that the union did not file a grievance prior to the announced cessation of production in June 2014, even though some 15-20 employees had been laid off by the end of 2014 due to reduction in Janumet production, because the company 'did not move the work.'" Award at 22 n6.

9

production overseas,[3] or that it acted manipulatively for the purpose of avoiding the restrictions imposed by Article 15.[4]  In the absence of such evidence, the arbitrator cannot be deemed to have "nullified" the Article's protections even if a finding in the Union's favor would also have been a defensible result.  It would be a vastly different case if Merck laid off Janumet producers at West Point while it hired Janumet producers elsewhere, or increased volume at other plants in lieu of production at West Point.  The most that can be said is that Merck responded to falling demand with elimination of jobs at West Point, without imposing similar pain on other plants and suppliers.  In essence, the arbitrator was required to apply Article 15 to a scenario of shrinking product demand with multiple suppliers producing.

### C.  Precedent does not support setting aside the award.

The Union cites several Third Circuit cases to support its claim that the arbitrator overstepped the strictures of his authority in this case.  These decisions, however, hinge on decidedly different issues than those raised here.

In *Pa. Power Co., supra,* the defendant company made a side agreement offering early retirement benefits contingent upon employee cooperation in improving plant efficiency.  The company deemed the improvements insufficient, and withheld the benefits from the workforce, while simultaneously offering the benefits to supervisors. This led to a grievance under the nondiscrimination provision of the controlling CBA.  The arbitrator entered an award extending the benefits beyond supervisors to all employees.  The Court of Appeals vacated the award

---

[3] It bears mention that Aesica is located in the United Kingdom, another modern industrial economy, and not in a developing country where costs and wages differ dramatically.  It further appears that some portion of its workforce is unionized.  *See* http://www.thejournal.co.uk/business/business-news/aesica-target-despite-job-cuts-4501876.

[4] The arbitrator was clearly sensitive to those concerns, finding the decision to cease production at West Point a "normal business decision," and finding no evidence of bias toward the bargaining unit.  Award at 22, 23.

because the CBA "specifically excludes supervisory employees from its terms," and found that the arbitrator overstepped his authority by disregarding this precise language from Article 15.

*Wilbur Chocolate Co. v. Bakery, Confectionary & Tobacco Workers' Int'l Union, Local 464*, 1988 WL 33881, at \*5 (E.D. Pa. Mar. 31. 1988), *aff''d*, 862 F.2d 312 (3d Cir. 1988), is similarly unhelpful to the Union's argument. The court there found an arbitrator's award defunct because it did not sufficiently defer to a previous arbitrator's award. In practical terms, this decision underscores the deference due to an arbitrator's decision upon judicial review.

The Union further cites *Newark Morning Ledger Co. v. Newark Typographical Union Local 103*, 797 F.2d 162 (3d Cir. 1986), but the holding there was based upon an arbitrator's error in basic arithmetic. Nor is *Citgo Asphalt Ref. Co. v. Paper, Allied-Industrial, Chemical & Energy Workers Int'l Union Local No. 2-991*, 385 F.3d 809 (3d Cir. 2004) relevant here, because the basis for vacating the award there was that the arbitrator applied two inconsistent standards of review.[5]

Finally, the Union cites a non-precedential decision, *Armstrong County Memorial Hospital v. United Steel, Paper, Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers,* 419 F.Appx. 217 (3d Cir. 2011), where the Court affirmed vacation of an arbitrator's award. Once again, the arbitrator's decision in that case patently violated the terms of the CBA. He struck down a hospital's no-smoking policy based upon longstanding practice and worker expectations, but the CBA specifically stated that the employer's rule-making authority was "not limited by existing or 'prior practices.'" *Id.*

---

[5] The CBA in *Citgo* forbade the arbitrator from considering the merits of the company's rulemaking unless the arbitrator first found that the rulemaking involved an abuse of discretion. The arbitrator made an express finding that there was no abuse of discretion, but nonetheless proceeded to consider the merits of the rulemaking

**IV. <u>Conclusion</u>**

Given the need to define "normally" under Article 15, the course of dealings between the parties (particularly West Point's explicit role as a supplemental supplier and Merck's large molecule-small molecule business strategy), and the fact that no jobs lost at West Point were recreated elsewhere, I am persuaded that, whether right or wrong, the arbitrator's decision was rooted in the language of the CBA.  For these reasons, the Union has failed to meet its difficult burden.  The arbitrator's award must be affirmed, and summary judgment is therefore granted to Merck.


<u>      /s/ Gerald Austin McHugh</u>    1/26/17
United States District Judge

12